UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

DALTON HILL and SARAH HILL,      )
                              )
          Plaintiffs,           )
                              )
v.                              )  No.: 3:14-CV-96-PLR-HBG
                              )
BLOUNT COUNTY BOARD         )
OF EDUCATION,                )
                              )
          Defendant.         )

## MEMORANDUM OPINION

Plaintiffs have brought this action alleging racial discrimination at William Blount High School in violation of federal law, specifically 42 U.S.C. § 1983, 42 U.S.C. § 2000(d) (Title VI), and the Equal Protection Clause of the Fourteenth Amendment. The Blount County Board of Education has moved for summary judgment on all of plaintiffs' claims [R. 84, 86]. Because plaintiffs' allegations fall short of establishing the deliberate indifference necessary to hold defendant responsible for the alleged racial discrimination, defendant's motions for summary judgment will be granted and this action dismissed in its entirety.

## I.  Standard for Summary Judgment

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving

party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 330 n. 2 (1986); *Moore v. Philip Morris Co., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and inferences to be drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Keifer*, 301 F.3d 937, 942 (6th Cir. 2002).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. *Celotex*, 477 U.S. at 317. To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Id.* at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250.

2

## II.  Request for Oral Argument

Plaintiffs request oral argument on defendant's motions for summary judgment [R. 98].  The court finds that the facts and legal arguments are adequately presented in the parties' papers, such that the decision process would not be significantly aided by oral argument.  Accordingly, plaintiffs' motion for oral argument [R. 98] is denied.

## III.  Factual Background – Sarah Hill

Sarah attended William Blount High School 9th Grade Academy during the 2010-11 school year.  Sarah then attended William Blount High School until she transferred to Hardin Valley High School for the Spring semester of her junior year to live with her mother and brother.  After her brother graduated, she transferred back to William Blount High School for her senior year and to graduate.  Sarah is of Asian descent.  On September 15, 2010, a boy sitting with Sarah at the lunch table asked her if she ate dog. Sarah left the table, was escorted to the office, and met with guidance counselor Bethanie Rinicker, who asked what happened, comforted Sarah, and told her she would talk with the offending student.  When Rinicker met with the accused student, he was frightened and remorseful.  Because this was the student's first offense, Rinicker informed him that such behavior would not be tolerated, warned him of the implications of continuing such behavior, and conducted sensitivity training with him.  School board policy provides that Level 1 Harassment may be addressed with "immediate intervention by the staff member," with a "verbal reprimand" and/or "counseling."

Rinicker later followed up with Sarah to see how she was doing; Sarah said she was fine and things between her and the student were fine.  Rinicker reminded her to

3

report any other incidents. Rinicker reported the incident and her response to Assistant Principal Cassandra Dowd. Even though the students did not have assigned lunch tables, Sarah continued to sit with the offending student voluntarily. Sarah testified there were no further incidents of harassment.

### IV. Factual Background – Dalton Hill

Dalton attended the William Blount High School 9th Grade Academy during the 2009-10 school year. He attended William Blount High School for two years after the Academy until he transferred to Hardin Valley High School for his senior year starting in the Fall semester of 2012. Dalton, like his sister Sarah, is of Asian descent. Dalton alleges he was subjected to racial discrimination and harassment from fellow students in the form of racial slurs such as "chink" and "pencil dick," as well as comments such as "go home to your country."

In February 2010, Dalton alleges he was approached by a student in the lunchroom who said his cat was missing and asked why "I ate it." Other students joined in the harassment joking about him eating the cat. The following morning in Mrs. Duke's math class, student C.M., along with other students harassed Dalton with additional "cat" comments, "slant-eye" gestures, and attempts to speak in an "Asian" accent. These incidents were reported to Assistant Principal Rob Clark. Dalton alleges that after he reported the harassment, he received an X-Box Live text message from C.M. stating "U kno I was f*ckin kiddin when I said that in mrs dukes and u go off and tell coach baumann on me when other people say it too, that's a bad move on ur part – btw."

4

In April 2010, Dalton states he found a page from his notebook on which someone had drawn a cartoon of a cat with a "before" picture and an "after" picture in which the cat was missing an ear, with a caption of "Do you really eat cats?" and "lol."

Dalton also alleges he was subjected to racial slurs and derogatory racial comments during soccer practice by student G.S. He was further subjected to racial slurs and derogatory racial comments during basketball practice by student J.L., and he was physically assaulted by J.L. in the locker room following a practice. In October 2010, he states he was racially harassed and physically assaulted by J.L. at the Maryville-Catholic high school football game. J.L. called him a "bitch" and an "Asian pussy," and threatened to "beat the Asian out of" him.

In September 2010, Dalton was written up by his Spanish teacher for defiance and disrespect. After meeting with an assistant principal, Dalton was given a one-day in-school suspension.

Dalton states that he transferred from William Blount High School to Hardin Valley Academy due to the racial harassment he experienced in William Blount High School. Dalton alleges the racial harassment incidents were reported to school employees and that the school failed to take necessary and appropriate action to end the harassment. He also alleges that the school board failed to implement anti-discrimination policies and failed to adequately train staff concerning issues of racial harassment and discrimination. Finally, Dalton alleges that the school board "caused, tolerated, perpetuated, and failed to correct a racially hostile environment . . . in violation of Title VI and the Fourteenth Amendment."

5

## V. Fourteenth Amendment Substantive Due Process

Claims for violations of substantive due process arising under the Fourteenth Amendment are enforceable through 42 U.S.C. § 1983. In order to recover under this statute, a plaintiff must show that a person acting under color of state law, deprived the plaintiff of a federal right. *McQueen v. Beecher Cnty. Sch.,* 433 F.3d 460, 464 (6th Cir. 2006).

Plaintiffs claim that the school, acting under color of state law, deprived them of their substantive due process right to an education. Under the Due Process Clause of the Fourteenth Amendment, no state can deprive "any person of life, liberty, or property, without due process of law." However, nothing in the language of the Due Process Clause itself requires the state to protect the life, liberty, and property of its citizens against invasions by private actors. *DeShaney v. Winnebago Cnty Dept. of Soc. Servs.,* 489 U.S. 189, 195 (1989). Absent one of two exceptions, it is not a constitutional violation for a state actor to fail to rescue those in need, and the state has no constitutional duty to protect or rescue its citizens. *Peete v. Metro. Gov't,* 486 F.3d 217, 223 (6th Cir. 2007). Exceptions to this rule apply when (1) the state has custody of the person in need or some other "special relationship" that heightens their responsibility to care for a particular citizen; or (2) when a state actor acts affirmatively to create or greatly increases the risk of harm to its citizens. *DeShaney,* 489 U.S. at 195.

In this case, plaintiffs do not allege that they were in state custody, or that any special relationship existed between plaintiffs and the school that would have given the school a heightened level of responsibility for their care and protection. While it may

6

seem that a school should provide a safe and supportive environment for the students in its care, it is well settled that a school does not meet the requisite level of control over its students to give rise to a constitutional duty to protect. *Vidovic v. Mentor City Sch. Dist.,* 921 F.Supp.2d 775, 791 (N.D.Ohio 2013). Plaintiffs have not cited any relevant facts or law that would support a finding that the school was in a "special relationship" as that term is used in the applicable case law. Therefore, the first exception to the general rule does not apply.

Under the state-created danger exception, liability may be assessed to the state if it causes or greatly increases the risk of harm to its citizens without due process of law through its own affirmative acts. *Kallstrom v. City of Columbus,* 136 F.3d 1055, 1066 (6th Cir. 1998). A state-created danger claim must establish three elements: (1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff. *Jones v. Reynolds,* 438 F.3d 685, 690 (6th Cir. 2006). This is a particularly demanding standard requiring that the state's affirmative action exposed the plaintiff to a danger plaintiff was not already subject to. *Sargi v. Kent City Bd. of Ed.,* 70 F.3d 907, 910-11 (6th Cir. 1995).

Plaintiffs have not made any allegations of affirmative acts by the school. Further, there is no evidence that the school acted affirmatively to create or increase a risk of harm to plaintiffs. The basis of this lawsuit is that the school failed to intercede when other

7

students were bullying plaintiffs; in other words, plaintiffs allege a failure to act, not an affirmative action, as the basis for their claims.

Both the United States Supreme Court and the Sixth Circuit have repeatedly held that a failure to act, even with knowledge that a risk of harm may exist without state intervention, is not enough to confer liability under the Fourteenth Amendment. *See DeShaney,* 489 U.S. at 197; *Jones v. Reynolds,* 438 F.3d 685, 691 (6th Cir. 2006); *Schroder v. City of Fort Thomas,* 412 F.3d 724, 728-29 (6th Cir. 2005). These cases have been applied to preclude recovery in cases presenting allegations similar to the allegations of deliberate indifference set forth by plaintiffs in this action. *See Soper v. Hoben,* 195 F.3d 845, 853 (6th Cir. 1999); *Mohat v. Mentor Exempted Village Sch. Dist. Bd. of Ed.,* 2011 WL 2174671 (N.D.Ohio May 31, 2011). Based on the existing case law, the school had no constitutional duty to protect or rescue plaintiffs from harm imposed by other students. Plaintiffs have not established that the school's alleged failure to stop the bullying plaintiffs suffered constitutes a violation of their substantive due process rights under the Fourteenth Amendment. Accordingly, the court finds defendant is entitled to summary judgment on plaintiffs' substantive due process claims.

## VI. Fourteenth Amendment Procedural Due Process

To state a claim for procedural due process, plaintiffs must allege (1) they have a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment; (2) that they were deprived of this protected interest within the meaning of the Due Process Clause; and 3) that the school did not afford them adequate procedural rights prior to depriving them of that protected interest. *Gunasekera v. Irwin,* 551 F.3d

8

461, 467 (6th Cir. 2009). The Supreme Court has held that in order to guard against unfair or mistaken findings of misconduct or arbitrary exclusion from school, "due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss v. Lopez,* 419 U.S. 565, 581 (1975).

Dalton was referred for discipline for disrespect and defiance by his Spanish teacher. An assistant principal met with Dalton, gave him the disciplinary notice from the teacher and allowed Dalton to explain his side of the story. The record shows that Dalton received all of the required due process protections before being assigned a one-day in-school suspension. The court finds there is no procedural due process violation and defendant is entitled to summary judgment on Dalton's procedural due process claim.

## VII.  Fourteenth Amendment Equal Protection

Plaintiffs allege that the school subjected them to disparate treatment based on race by effectively causing, encouraging, accepting, tolerating and/or failing to correct a racially hostile environment of which the school had knowledge. Further, plaintiffs allege the school failed to follow its policies regarding bullying and failed to adhere to its grievance procedure, unreasonably interfering with plaintiffs' learning opportunities and ability to participate in and/or benefit from all educational programs, services, activities and privileges provided by the school.

The Equal Protection Clause prevents states from making distinctions that:  (1) burden fundamental rights; (2) target a suspect class; or (3) intentionally treat one

9

individual differently from others similarly situated without any rational basis. *Johnson v. Bredesen,* 624 F.3d 742, 746 (6th Cir. 2010). In this case, plaintiffs allege a violation of the Equal Protection Clause based on the school's alleged targeting of a suspect class. To state a claim under the "suspect class" section of the Equal Protection Clause, a plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class. *LRL Properties v. Portage Metro Hous. Auth.,* 55 F.3d 1097, 1111 (6th Cir. 1995). A plaintiff may also allege that school officials acted with deliberate indifference to discrimination by other students, thereby demonstrating their intent to effectuate or prolong the discrimination. *Schroeder v. Maumee Bd. of Ed.,* 296 F.Supp.2d 869, 874 (N.D.Ohio 2003). A claim of deliberate indifference, however, still requires that plaintiffs demonstrate that the school acted with a discriminatory intent when it failed to respond to student-on-student harassment. *Williams v. Port Huron Sch. Dist.,* 455 Fed. Appx. 612, 618 (6th Cir. 2012).

To prevail on a claim for violation of the Equal Protection Clause, plaintiffs must show that they suffered severe, pervasive and objectively offensive harassment on the basis of their nationality. *Id.* Further, plaintiffs must demonstrate that the school participated in or advanced the discrimination either by discriminating themselves, or by deliberately ignoring known discrimination by other students. Deliberate indifference can be found when there has been a "clearly unreasonable response in light of the known circumstances." *Vance v. Spencer Cnty. Pub. Sch. Dist.,* 231 F.3d 253, 260 (6th Cir. 2000).

In this case, a comprehensive review of the record provides the court with no basis upon which to find that the school either intentionally discriminated against plaintiffs based on their nationality, or that the school was deliberately indifferent to discrimination by students based on plaintiffs' nationality. First, Sarah only reported one racial harassment incident. Rinicker met with the accused student, and informed him that such behavior would not be tolerated in the future. Rinicker then told Sarah to report any other incidents. Sarah testified that the offending student never bullied or racially harassed her after Rinicker counseled him. Sarah argues that Rinicker did not follow school policy by talking to the offending student and not suspending him. However, school policy provides for "verbal reprimand" and/or "counseling" as disciplinary options for harassment. A student does not have a right to a particular remedial demand. *Vance*, 231 F.3d at 260. Further, Sarah admitted that she had no problems after the one incident.

Dalton alleges that he was given excessive discipline for being defiant and disrespectful, yet the students that he alleged discriminated against him did not get punished. However, the students that Dalton accused were investigated, disciplined, remorseful, and apologized. Dalton was disrespectful to a teacher. He was allowed to explain, was not remorseful, and did not take responsibility for his actions. These incidents are not comparable. In the absence of any disparate treatment, Dalton cannot sustain an equal protection claim based on intentional discrimination. Accordingly, the court finds defendant is entitled to summary judgment on plaintiffs' Equal Protection claim.

The facts of this case demonstrate that the school's actions were reasonable under the circumstances and complied with its policies when the incidents of racial harassment were reported.

## VIII.  Title VI

Plaintiffs allege that school employees were deliberately indifferent to their rights resulting in a "racially hostile environment" at school.  Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, states that "no person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  The rights established by this statute are privately enforceable by a student enrolled in a public school district that receives federal funds.  Deliberate indifference to student-on-student harassment is actionable pursuant to Title VI.  *Mullins v. Tenn. State Univ.,* 99 F.3d 1352, 1356 (6th Cir. 1996).  For student-on-student racial harassment, courts have adopted the requirements laid out by the Supreme Court in *Davis v. Monroe Cnty. Bd. of Ed.,* 119 S. Ct. 1661 (1999).

To prevail on a claim for student-on-student racial harassment under Title VI, plaintiffs must establish:  (1) the harassment was so severe, pervasive and objectively offensive that it could be said to deprive plaintiffs of access to the educational opportunities or benefits provided by the school; (2) the school had actual knowledge of the harassment; and (3) was deliberately indifferent to the harassment.  *Maislin v. Tenn. State Univ.,* 665 F.Supp.2d 922, 931 (M.D.Tenn. 2009).  The Sixth Circuit has explained the type of conduct that satisfies the deliberate indifference standard as follows:

12

The [school] is not required to "remedy" harassment nor ensure that students conform their conduct to certain rules, but rather, "the [school] must merely respond to known peer harassment in a manner that is not clearly unreasonable." The deliberate indifference standard "does not mean that [schools] can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." The standard does not mean that [schools] must expel every student accused of misconduct. Victims do not have a right to particular remedial demands. Furthermore, courts should not second guess the disciplinary decisions that school administrators make.

*Vance,* 231 F.3d at 260.

In support of their claims, plaintiffs submit an investigative report from the Tennessee Department of Education which found a racially hostile environment existed in William Blount High School and the 9th Grade Academy. The report found the school had actual knowledge of the racially hostile environment and student-on-student harassment against Dalton. The report further found the school board failed to follow the district's policy regarding bullying and harassment based on race, including failing to reduce reports of racial harassment to writing, and teachers failing to notify the administration of reports of harassment. Plaintiffs argue this report shows the school board was deliberately indifferent to their complaints of harassment. The court disagrees.

First, the investigative report is hearsay because it is a statement by an out-of-court declarant offered for the truth of the matter asserted. To be admissible as a public record under Fed.R.Evid. 803(8)(c), the Sixth Circuit suggests four factors to evaluate trustworthiness: (1) the timeliness of the investigation upon which the report is based; (2) the special skill or experience of the investigator; (3) whether the agency held a hearing; and (4) possible motivational problems. *Alexander v. CareSource,* 576 F.3d 551, 563

13

(6th Cir. 2009). This list of factors is not exclusive; "any circumstances which may affect the trustworthiness of the underlying information, and thus, the trustworthiness of the findings, must be considered when ruling upon the admissibility of the actual findings under this rule." *Id.*

Assuming, arguendo, that the state investigative report is a public record, the conclusions reached by the person investigating plaintiffs' complaint are offered by plaintiffs for the truth of the matter, based on complaints by Dalton's mother, and constitute inadmissible hearsay. Mrs. Hill testified in her deposition that she was never present or personally heard any racial comments directed toward her children and that her information was told to her by her children. Without personal knowledge, her testimony is inadmissible as hearsay pursuant to Fed.R.Evid. 602.

Moreover, the court has discretion under Fed.R.Evid. 403 to exclude such reports if their probative value is substantially outweighed by prejudicial effect or other considerations. *E.E.O.C. v. Ford Motor Co.,* 1996 WL 557800 at *10 (6th Cir. 1996). The Sixth Circuit has concluded that administrative findings do not create a material issue of fact when the court has access to just as much of the evidence as the agency did. *Alexander,* 576 F.3d at 563.

Here, the court has the same facts as reported to the state investigator and is capable of making its own determination whether there are material issues of fact in this case precluding summary judgment. The investigator relied on interviews with plaintiffs, their mother, and some of the school employees. None of the statements were verified. The unverified nature of the evidence relied on by the state investigator is sufficient

14

reason to find the report is not trustworthy enough to be admissible. In contrast, the court has before it in the record verified witness statements as well as deposition testimony as to the facts in this case.

The school was aware of only one incident concerning Sarah. Sarah admitted that she had no further problems after the offending student was counseled. There is no clear and persistent pattern of racial discrimination. Sarah has failed to establish the necessary elements to sustain a violation of her rights and the school board is entitled to judgment as a matter of law.

Addressing Dalton's claim, he must demonstrate that the alleged racial harassment was so severe, pervasive and objectively offensive that it deprived him of access to educational opportunities or benefits provided by the school. Courts "must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults." *Davis v. Monroe Cnty. Bd. of Ed.,* 526 U.S. 629, 651 (1999). Moreover, it is "understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the student subjected to it." *Id.* Damages are not available for "simple acts of teasing and name calling among school children" even when those comments target differences. *Id.*

Dalton's mother reported the racial slurs to Dalton's teachers, but could not tell them who make the comments because Dalton did not identify the students. For a school district to be liable for damages, an "appropriate person" must have had actual notice of the harassment and an opportunity to rectify any violation. *Gebser v. Lago Vista Indep.*

15

*Sch. Dist.,* 524 U.S. 274, 290 (1998). In February 2010, Assistant Principal Clark met with Dalton and his parents. Dalton was reluctant to name the students who had made racial remarks to him. For the incidents where Dalton identified students, Clark assured Dalton and his parents that he would investigate their complaints. Clark met with the named students. Only one incident was confirmed and that student was written up for inappropriate behavior for talking with an accent teasing another student. After the meeting, the student's infraction was amended to include "Disrespect for student/made racial comments using an accent toward another student." Although the student denied harassing Dalton during basketball, Clark alerted the coaches to be aware of future incidents of harassment.

Clark testified that no other remarks by the other named students could be substantiated. Nevertheless, Clark reviewed the harassment policy with each of the students, discussed the consequences of engaging in this behavior, and notified each student's parents. Clark spoke with Dalton's mother regarding the outcome of the investigation. In addition, Assistant Principal Cassandra Dowd and Clerk immediately alerted all Academy teachers by email to increase their supervision of students, and to monitor the hallways and lunchroom in an effort to prevent and address these issues. Dowd and Clark also met with Dalton's teaching team. Dalton's teachers reported that they were not aware of any harassment.

The soccer coach, Mark Burnett, could not confirm any harassment, but held a team meeting and reported what Dalton's mother had told him to the Athletic Director.

The student who had drawn the "cat" picture apologized to Dalton. School staff explained the racial harassment policies and the student was warned that he would be suspended if anything happened again, even if it was joking. Unsubstantiated claims resulted in no discipline. The record shows that each time Dalton's mother reported a specific complaint of harassment (Dalton did not report any incidents of harassment), the school investigated promptly and thoroughly by interviewing the accused students, viewing video recording when available, disciplining students when the allegations were substantiated, and taking steps to stop further harassment. At the conclusion of each investigation, even when the allegations were not substantiated, the school issued verbal warnings, counseled with sensitivity training, and contacted the accused student's parents.

Moreover, the school board developed proactive steps to reduce opportunities for future harassment with a plan for Dalton upon his entry into William Blount High School because the current school year was about to end. The plan offered Dalton a specific time to meet with someone, perhaps his guidance counselor, to discuss how things were going especially as to any racial harassment, encourage Dalton to document incidents, or immediately report any incidents to facilitate a timely investigation. Dalton's mother did not contact Dowd about the plan; nevertheless, Dowd informed the assistant principals at the school and Dalton's guidance counselor about the events that had occurred at the Academy. Dalton never reported any racial incidents while attending William Blount High School.

Dalton argues that he was deprived of his right to an education because he was essentially forced to withdraw from William Blount High School and enroll at Hardin Valley Academy due to the alleged bullying; however, he cites no legal authority for his argument that this constitutes a deprivation of his rights under the Constitution. Even if there is a constitutional right to a public education, there is no indication that the school deprived Dalton of his education, or that it required him to switch schools.

The record here shows that the school responded and investigated promptly all reported claims of racial harassment, disciplined the only substantiated offender, and implemented remedial measures. Accordingly, the court cannot find that the school was deliberately indifferent to Dalton's complaints, and the school's actions were reasonable under the circumstances.

Plaintiffs have provided no evidence of either an affirmative act of nationality-based discrimination by the school, or deliberate indifference to known severe, pervasive and objectively offensive student-on-student nationality-based discrimination. Contrary to plaintiffs' assertions that the school did nothing to prevent the alleged harassment and the school's harassment training was inadequate, the record shows that the school employees are trained regarding harassment and the school board has policies to deter racial hostility and discrimination.

Annually in July, all school principals are trained, and teachers are trained during the week of in-service prior to the beginning of school. At the beginning of each school year, students are provided handbooks which include the school board's nondiscrimination policies and procedures. Students and their parents/guardians are

18

required to sign acknowledgements that they have read and understand the rules and regulations and that the students will be subject to the policies. The policies and procedures are also reviewed with the ninth grade students by the homeroom teachers through their Freshman Focus program.

These undisputed facts show that the school board fulfilled its Title VI obligations in responding to plaintiffs' claims of a racially hostile environment in their schools. Even viewing the record in the light most favorable to plaintiffs, proof is lacking as to what the school board could have or should have done differently in order to bring the alleged harassment to a stop. Lax enforcement of a school policy is not sufficient to establish discriminatory purpose. *Washington v. United States,* 401 F.2d 915, 925 (1968). In arguing that the school board should have gone further, plaintiffs are making "particular remedial demands," to which they are not entitled. *Vance,* 231 F.3d at 260. Accordingly, defendant is entitled to summary judgment as to plaintiffs' Title VI claims.

## IX.  Section 1983 Claims

Municipalities are not liable under § 1983 for every misdeed of their employees and agents; instead, it is when execution of a municipality's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury that a municipality is responsible under § 1983. *Garner v. Memphis Police Dept.,* 8 F.3d 358 (6th Cir. 1993). The doctrine of *respondeat superior* does not apply to municipalities in § 1983 actions. *Monell v. Dept of Social Servs.,* 436 U.S. 658, 691 (1978). In order to hold the school board liable, plaintiffs must establish that they have asserted the deprivation of a constitutional right, and that the school board

19

is responsible for the violation because of an official policy or custom. *Doe v. Claiborne Cnty Bd. of Ed.,* 103 F.3d 495, 505-06 (6th Cir. 1996). Plaintiffs must show that the school board itself is the wrongdoer and that the school board's deliberate indifference was a direct causal link in the constitutional violation. That is, plaintiffs must show that the particular injury was incurred because of the execution of the policy. *Williams v. Paint Valley Local BCBE,* 400 F.3d 369 (6th Cir. 2004).

Plaintiffs argue the "custom" attributable to the school board was its failure to act or to take reasonably adequate actions to correct the bullying. Under this theory, plaintiffs must establish: (1) the existence of a clear and persistent pattern of racial harassment by school employees, not just students; (2) which the school board knew or should have known about; (3) the school board's approval of the unconstitutional conduct "such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction;" and (4) the school board's policy was the "moving force or direct causal link in the constitutional deprivation." *Doe,* 103 F.3d at 508. Additionally, plaintiff must show that the particular injury was incurred because of the execution of school board policy. *Garner,* 8 F.3d at 364. "Deliberate indifference in this context does not mean a collection of sloppy, or even reckless, oversights; it means evidence showing an obvious, deliberate indifference to . . . abuse." *Id.*

As previously discussed, plaintiffs have not provided any evidence establishing the violation of any constitutional right owed to them. Plaintiffs' complaint states that the school board failed to act or take reasonably adequate actions to correct the racial harassment, but the school's failure to stop third parties from harassing plaintiffs does not

20

rise to the level of a constitutional violation.  There is no constitutional right to protection

from the acts of third parties absent certain exceptions which do not exist in this case.

Further, plaintiffs have not identified any procedural due process rights that were

violated, and have not established any Equal Protection claims under the Constitution.

The court finds that plaintiffs' complaint does not satisfy the requirements for a § 1983

*Monell* claim against the school board.

Plaintiffs also fail to satisfy the second requirement for this claim.  The allegations

against the school board are centered on the board's alleged inaction with regard to

establishing proper policies to curb bullying in its schools.  However, plaintiffs have not

shown a clear and persistent pattern of violation by the school board.  Annually in July,

training is conducted with all school principals, who then train teachers during the week

of in-service prior to the beginning of school, and the policies are included in the Blount

County School Employee Handbook.  At the beginning of each school year, the students

were provided handbooks which include the board's nondiscrimination policies and

procedures,  the  students  and  their  parents/guardians  are  required  to  sign

acknowledgments that they have read and understand the rules and regulations, and that

the students will be subject to the policies.  The policies and procedures are also reviewed

with the students either in an assembly or by the homeroom teachers, and the policies are

also covered with Academy students during homeroom through Freshman Focus.

Further, there is no identification of any action the school board could have taken

that would have insured that plaintiffs would not be bullied.  There is no indication that

the school's alleged inaction was the "moving force" behind or constituted a direct causal link to the constitutional deprivations plaintiffs alleged in this case.

Accordingly, under the relevant law, plaintiffs have not stated a cause of action against the school under § 1983, and the court finds defendant is entitled to summary judgment on plaintiffs' § 1983 claims.

### X.  Conclusion

In light of the foregoing discussion, Blount County Board of Education's motions for summary judgment [R.84, 86] are **GRANTED, and this action is dismissed in its entirety.**

_____

**UNITED STATES DISTRICT JUDGE**

22